# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Apple iPhone w/ red, white, and black case seized under<br>FP&F Number 2023250100012901 | Case No. **23mj0775** |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  ❒ evidence of a crime;

  ❒ contraband, fruits of crime, or other items illegally possessed;

  ❒ property designed for use, intended for use, or used in committing a crime;

  ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC sec. 1591 | Sex Trafficking by Force, Fraud, and Coercion |

The application is based on these facts:
See Attached Affidavit of HSI Special Agent Aron Marcellus, incorporated herein by reference.

  ☑ Continued on the attached sheet.

  ❒ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Aron Marcellus, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 03/03/2023

*Judge's signature*

City and state: San Diego, California    Hon. ALLISON H. GODDARD, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Aron C. Marcellus, Special Agent with Homeland Security Investigations, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant to search the following electronic device, as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 18, United States Code, Sections 1591, as more particularly described in Attachment B:

Apple iPhone w/ red, white, and black case seized under FP&F Number 2023250100012901

**(Target Device)**

This search supports an investigation conducted by Homeland Security Investigations (HSI), in conjunction with the San Diego Human Trafficking Task Force (SDHTTF), into Darrell DAVIS (**DAVIS**) who is charged with the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on January 11, 2023 during DAVIS's arrest for sex trafficking of an adult female (AF1) through force, threats of force and coercion. The **Target Device** is currently in the possession of SDHTTF.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances

described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Device**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

6. I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations. These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

7. Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews,

made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

8. Since October 2019, I have been assigned to the SDHTTF where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

9. My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

10. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a. Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b. Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

    c.    Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

    d.    Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

    e.    Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

    f.    Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removal hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, and phone numbers in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with co-conspirators and clients, as well as telephone books containing contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution. Moreover, I know that digital evidence can be stored on

4

a variety of systems and storage devices including: hard disk drives, DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g.  Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

11.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

12.  On January 10, 2023, an 18-year-old female (AF1) contacted the San Diego Police Department (SDPD) and advised she was a victim of human trafficking. AF1 advised SDPD that she had been forcefully sex trafficked by Darrell DAVIS (aka "Benzo"), from Sacramento, CA to San Diego, CA. SDPD contacted the HTTF, who responded to the scene and assumed the investigation.

13. HTTF investigators interviewed AF1. The interview was audio/video recorded in its entirety, via Body Worn Camera (BWC). The below statement is a synopsis and is not intended to take the place of the recording. Refer to the BWC recording for AF1's verbatim statement: AF1 met DAVIS in March of 2022, when she was 17 years old. AF1 was introduced to DAVIS by two unknown female prostitutes, where she learned he was a "pimp"[1]. Upon contact, DAVIS and AF1 had sexual intercourse and he explained his rules as her pimp. Some of the rules included a $1,000 daily quota, no talking to other pimps, and AF1 was required to work six days per week. DAVIS also required AF1 to give him all of her prostitution earnings and to delete her cell phone messages in order to avoid law enforcement.

14. AF1 worked as a prostitute for DAVIS from March until sometime in May of 2022. During that timeframe, DAVIS transported AF1 to the "blade"[2] in Oakland, CA several times. While on the blade in Oakland, DAVIS would often supervise AF1 and collect her earnings after each prostitution date. AF1 eventually decided she no longer wanted to work as a prostitute for DAVIS because he had become verbally abusive and did not live up to his promises. AF1 subsequently blocked DAVIS's phone number and social media accounts.

---

[1] Based on my training and experience, I know a "Pimp" to be a person who controls and financially benefits from the commercial sexual exploitation of another person. The relationship can be abusive and possessive, with the pimp using techniques such as psychological intimidation, manipulation, starvation, rape and/or gang rape, physical abuse, confinement, threats of violence toward the victim's family, forced drug use, and the shame from these acts to keep the sexually exploited person under control.

[2] Based on my training and experience, I know a blade, track, or stroll as a geographical area known for prostitution activity, where prostitutes gather to be solicited by those seeking to exchange sex for money.

15. AF1 did not have contact with DAVIS until sometime around Christmas in December of 2022, when she received a friend request via social media. The request was sent from DAVIS's social media account. AF1 reached out to DAVIS via text message and inquired why he had sent her a friend request. DAVIS then began to "finesse"[3] AF1 to work for him as a prostitute again, to which she declined.

16. A couple days after rekindling communication with DAVIS, AF1 was involved in a vehicle collision with a 20-year female (AF2). The vehicle in which AF1 crashed, belonged to AF2. At the time of the collision, AF2 was working for DAVIS as a prostitute.

17. AF1 advised AF2 that she would pay her for the vehicle damages. However, due to AF2 working for DAVIS, AF1 had to pay DAVIS for the damages. AF1 subsequently called DAVIS, who agreed to pay for the vehicle damage. DAVIS estimated the damages would cost $2,300, which AF1 agreed to pay with earnings from her job at Amazon. DAVIS refused to accept AF1's Amazon earnings and demanded she work off her debt by way of prostitution. AF1 had previously seen DAVIS become physically abusive towards women and feared he would hurt her if she refused to fulfill his demand. Additionally, DAVIS knew where AF1 lived, and she feared he would retaliate against her if she did not agree. AF1 then began to work for DAVIS as a prostitute once again.

18. On December 28, 2022, DAVIS transported AF1 to San Diego, CA for the means of sex trafficking. While enroot to San Diego, DAVIS and AF1 spent one night in Salinas, CA and two nights in Los Angeles, CA, both of which

---

[3] Based on my training and experience, I know "finesse" as a term used to describe the way in which a sex trafficker uses his charisma and flaunts his accessories, attire, money, jewelry etc. to lure and to recruit victims based off his supposed lavish lifestyle.

she worked as a prostitute under DAVIS's direction. While in San Diego, DAVIS made AF1 an online sex advertisement on "Megapersonal.com". Using a law enforcement search tool, I located AF1's advertisement on Megapersonals.com, which was posted on December 30th, 2022. This was consistent with AF1's statement and the timeframe in which she was in San Diego. AF1 believes she left San Diego with DAVIS sometime around the 31st of December and returned to Sacramento.

19. On January 6, 2022, DAVIS transported AF1 and AF2 to San Diego for the purpose of sex trafficking. During this trip, DAVIS was also accompanied by his 21-year-old friend, identified as J.B.. All four adults stayed at the Hotel Milagro in the Chula Vista, CA. This was later confirmed with a hotel registry check, in which AF2's identification card was used to rent the room. During their stay in Chula Vista, DAVIS transported AF1 and AF2 to the "blade", where he would standby as security and to collect money after each prostitution date. AF1 advised DAVIS was in possession of a black and brown handgun, which he commonly kept on his person.

20. While in San Diego, AF1 kept track of her debt owed to DAVIS for the vehicle damage. AF1 earned $2,300 from her prostitution dates, which was all given to DAVIS. Although AF1 had earned the agreed debt amount, DAVIS began to increase the amount for no apparent reason. This made AF1 feel trapped and that she had to continue to work for DAVIS.

21. On January 10, 2022, AF1 advised DAVIS that she no longer wanted to work for him as a prostitute. DAVIS became enraged, told AF1 she was not going to leave, and struck her in the face with his hand. AF1 had visible redness to the side of her face, further corroborating her statement. Due to DAVIS's physical violence and fear of further abuse, AF1 agreed to stay with him and return

to the blade.  Once AF1 returned to the blade, she contacted SDPD and was given a ride to the police station.

22.   AF1 gave investigators consent to search her cell phone.  Within AF1's cell phone, Investigators located electronic evidence corroborating her statement.  Below is an example of the electronic evidence obtained:









23. Based on my training and experience, as well as my discussions with other law enforcement officers experienced in human trafficking investigations, I know that the language used by DAVIS and AF1 in the above text message exchanges is indicative of individuals who are involved in commercial sex.

24. Based on my training and experience, I know "trick" as a slang term used to describe a sex buyer (*noun*), or to describe the commission of a prostitution act (*verb*). A victim is said to be "with a trick" or "turning a trick."

25. DAVIS and AF1 mention a "date" within their message exchange. Based on my training and experience, I know a "date" to be a term used to describe the exchange when prostitution takes place, or the activity of prostitution. Within the sex trafficking subculture, a victim is commonly said to be "on a date" or "with a date."

26. Within the message exchange, DAVIS tells AF1 she is, "fagging off". Based on my training and experience, I know the term "fagging off" as a term used within the sex trafficking subculture to describe the behavior of a prostitute who disobeys their trafficker and is attempting to leave.

27. On January 11, 2023, HTTF contacted DAVIS outside of Hotel Milagro, where he was taken into custody. At the time of arrest, the **Target Device** was found in DAVIS's pants pocket (subsequently seized under FP&F Number 2023250100012901). HTTF contacted the occupants of DAVIS's hotel room, where they were met by AF2 and J.B. Both AF2 and J.B. gave investigators consent to search the hotel room. Additionally, J.B. was determined to have an active Fourth amendment waiver. During a search of the hotel room, investigators located a loaded non-serialized handgun. The handgun was black and brown, consistent with AF1's statement.

28.     During a post Miranda interview with J.B., he corroborated AF1's statement and stated that DAVIS transported AF1 and AF2 to San Diego for the purposes of commercial sex trafficking. J.B. also told investigators that the firearm located in the hotel room belonged to DAVIS, which he used as protection while engaged in sex trafficking of AF1 and AF2.

29.     During an interview with AF2, she stated that she was in an intimate dating relationship with DAVIS for approximately one month prior to police contact. AF2 would not speak about DAVIS, but gave investigators consent to search her cell phone. During a search of AF2's cell phone, investigators discovered text message threads and photos indicative of individuals involved in commercial sex.

18.     Based on these statements, along with the other messages exchanged during the conversation, I believe that DAVIS, beginning on or about December 30, 2022, did knowingly recruit, persuade, induce, and entice an individual (AF1) through force, threats of force and coercion to engage in prostitution.

## METHODOLOGY

20.     It is not possible to determine, merely by knowing the mobile electronic device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Mobile electronic devices, including cellular telephones and tablets, can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers and installable software now allow for their subscribers and users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a

secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many mobile electronic devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some mobile electronic device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and its memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN DATA

23. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

24. Based on the foregoing, I submit there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, 18 U.S.C. §§ 1591, as described in Attachment B, will be found in the property to be searched, as described in Attachment A.

25. I therefore respectfully request that this Court issue warrants authorizing me, an HSI Special Agent, or another law enforcement officer, to search the **Target Device**, as described in Attachment A and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Aron Marcellus
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 3rd day of March 2023.

_____
HONORABLE ALLISON H. GODDARD
United States Magistrate Judge

16

## ATTACHMENT A
## ITEM TO BE SEARCHED

The property/items to be searched is/are described as follows:

Apple iPhone with a red, white, and black case seized under FP&F Number
2023250100012901
**(Target Device)**

The **Target Device** is currently being held at the San Diego Human Trafficking Task Force located at 9425 Chesapeake Dr. San Diego, CA 92123.

# ATTACHMENT B
# ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, photographs, audio files, video, telephone numbers, contact information, web browsing history, documents, data stored within applications, and location data, for the period of March 01, 2022, up to and including January 11, 2023:

a. tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate human trafficking;

c. tending to identify co-conspirators, criminal associates, or others involved in human trafficking;

d. tending to identify funding sources, bank accounts, and financing methods involved in human trafficking;

e. tending to show efforts to solicit commercial sex acts on websites including but not limited to megapersonals.com or skipthegames.com;

f. tending to identify travel to or presence at locations used for commercial sex acts;

g. tending to identify the user of, or persons with control over or access to, the subject phone; and/or

h.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 18, United States Code, Sections 1591.**

The seizure and search of the cellular phones shall follow the procedures outlined in the methodology section in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phones may be searched for the evidence above.